**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



**FILED**

Jan 31 2013, 9:19 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**BRENT C. VIAN**
Fort Wayne, Indiana

ATTORNEYS FOR APPELLEE:

**ROBERT J. HENKE**
DCS Central Administration
Indianapolis, Indiana

**MICHAEL SPECIALE**
DCS, Allen County Office
Fort Wayne, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| IN RE THE INVOLUNTARY TERMINATION OF THE PARENT-CHILD RELATIONSHIP OF S.F.: | ) ) ) ) | |
| C.P., | ) ) | |
| Appellant-Respondent, | ) ) | |
| vs. | ) ) | No. 02A03-1206-JT-275 |
| THE INDIANA DEPARTMENT OF CHILD SERVICES, | ) ) ) | |
| Appellee-Petitioner. | ) ) ) | |

APPEAL FROM THE ALLEN SUPEIOR COURT
The Honorable Charles F. Pratt, Judge
Cause No. 02D08-1108-JT-135

**January 31, 2013**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**FRIEDLANDER, Judge**

C.P. (Father) appeals the involuntary termination of his parental rights to his child, S.F. Father challenges the sufficiency of the evidence supporting the juvenile court's judgment.

We affirm.

Father is the biological father of S.F., born in May 2006.[1] The facts most favorable to the trial court's judgment reveal that Father was incarcerated at the time S.F. was born. Father remained incarcerated for the first three years of S.F.'s life. Shortly after his release from incarceration, Father became acquainted with S.F., and in September 2009, Mother left S.F. in Father's care because she was homeless and unable to care for S.F. At that time, S.F. had head lice, a urinary tract infection, and an upper respiratory infection. Approximately three weeks later, Mother contacted local police personnel due to a custody dispute between her and Father concerning S.F., but the police refused to remove S.F. from Father's care because Mother was unable to verify that she had appropriate housing for herself and S.F. The local Allen County office of the Indiana Department of Child Services (DCS) was thereafter contacted and an assessment of the matter ensued.

A Preliminary Inquiry was held in October 2009, after which the juvenile court determined there was probable cause to believe S.F. was a child in need of services (CHINS). An evidentiary hearing on an amended CHINS petition was held in November 2009. During

---

[1] S.F.'s biological mother, T.F. (Mother), voluntarily relinquished her parental rights to S.F. in February 2012. Mother does not participate in this appeal. In addition, S.F.'s sibling, R.V., who was also removed from the family home with S.F., is not Father's biological child and is not subject to this appeal. We therefore limit our recitation of the facts to those pertinent solely to Father's appeal of the juvenile court's judgment terminating Father's parental rights to S.F.

2

the CHINS hearing, Father admitted to a majority of the allegations in the CHINS petition and S.F. was so adjudicated. The court proceeded to disposition the same day and, following the hearing, the juvenile court issued a dispositional order formally removing S.F. from Father's custody.

The juvenile court's dispositional order allowed S.F. to continue living with Father as an in-home CHINS in the maternal grandmother's home. The court's order, however, incorporated a Parent Participation Plan (PPP) and directed Father to successfully complete a variety of tasks and services designed to address his parenting deficiencies. Among other things, Father was ordered to: (1) refrain from all criminal activity; (2) obtain a legal and stable source of income; (3) maintain clean, safe, and appropriate housing at all times; (4) submit to a psychological evaluation and parenting assessment and follow any resulting recommendations; (5) successfully complete the home-based services program through Park Center; (6) refrain from the use of alcohol, illegal drugs, or other substances and submit to random drug screens; (7) participate in parenting classes through Caring About People, Inc.; (8) follow the safety plan established by the DCS case manager which prohibited Father from allowing S.F. to be left in the unsupervised company of the maternal grandmother; (9) maintain consistent contact with DCS; and (10) notify DCS within forty-eight hours of all changes in household composition, housing, and employment.

Father's participation in services was inconsistent and ultimately unsuccessful. Father failed to obtain a psychological evaluation, engage in home-based services, and refrain from criminal activities. In January 2010, Father was arrested and incarcerated in Noble County

but failed to notify DCS. Several days later, DCS learned of the arrest and found S.F. had been living with the maternal grandmother for approximately two days before the child was moved to the paternal grandfather's home. The paternal grandfather had been previously disqualified as an appropriate caregiver because of a 1978 rape conviction. Consequently, S.F. was taken into emergency protective custody and placed in foster care. Father continued to be in and out of jail for the remainder of the CHINS case, and in September 2011, DCS filed a petition seeking the involuntary termination of Father's parental rights to S.F.

A two-day evidentiary hearing on the termination petition was eventually held in February 2012. During the termination hearing, DCS presented significant evidence establishing that Father remained incapable of providing S.F. with a safe and stable home environment, and that Father had failed to complete a majority of the court-ordered reunification services, including a parenting assessment and classes, a psychological evaluation, and home-based services. DCS also established that Father had a significant history of criminal activities, was arrested and incarcerated several times during the underlying proceedings on various charges including theft and violating the terms of his probation, and most recently had been incarcerated since approximately September 2011 with a projected release date not until March 2012. As for S.F., DCS presented evidence showing the child was thriving in pre-adoptive relative foster care together with R.V.

At the conclusion of the termination hearing, the juvenile court took the matter under advisement. On May 14, 2012, the juvenile court entered its judgment terminating Father's parental rights to S.F. Father now appeals.

Initially, we note that when reviewing the termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses. *In re D.D.*, 804 N.E.2d 258 (Ind. Ct. App. 2004), *trans. denied*. Instead, we consider only the evidence and reasonable inferences that are most favorable to the judgment. *Id*. In deference to the juvenile court's unique position to assess the evidence, we will set aside the court's judgment terminating a parent-child relationship only if it is clearly erroneous. *In re L.S.*, 717 N.E.2d 204 (Ind. Ct. App. 1999), *trans. denied*. Thus, if the evidence and inferences support the juvenile court's decision, we must affirm. *Id.*

Here, the juvenile court made detailed findings in its order terminating Father's parental rights to S.F. Where the juvenile court enters specific findings of fact and conclusions thereon, we apply a two-tiered standard of review. *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143 (Ind. 2005). First, we determine whether the evidence supports the findings, and second we determine whether the findings support the judgment. *Id.* "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind. 1996). A judgment is clearly erroneous only if the findings do not support the juvenile court's conclusions or the conclusions do not support the judgment thereon. *Quillen v. Quillen*, 671 N.E.2d 98.

Initially, we recognize that the traditional right of parents to "establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." *In re M.B.*, 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), *trans. denied*. Although

5

parental rights are of a constitutional dimension, the law provides for the termination of these rights when parents are unable or unwilling to meet their parental responsibilities. *In re R.H.*, 892 N.E.2d 144 (Ind. Ct. App. 2008). In addition, a juvenile court must subordinate the interests of the parents to those of the child when evaluating the circumstances surrounding the termination. *In re K.S.*, 750 N.E.2d 832 (Ind. Ct. App. 2001).

Before an involuntary termination of parental rights may occur in Indiana, the State is required to allege and prove, among other things:

(B)     that one (1) of the following is true:

   (i)     There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

   (ii)    There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

   (iii)   The child has, on two (2) separate occasions, been adjudicated a child in need of services.

Ind. Code Ann. § 31-35-2-4(b)(2)(B) (West, Westlaw through end of 2011 1st Regular Sess.).[2] The State's burden of proof for establishing these allegations in termination cases "is one of 'clear and convincing evidence.'" *In re G.Y.*, 904 N.E.2d 1257, 1260-61 (Ind. 2009) (quoting Ind. Code Ann. § 31-37-14-2 (West, Westlaw through end of 2011 1st Regular Sess.)). If the court finds that the allegations in a petition described in section 4 of this

---

[2] We observe that Indiana Code section 31-35-2-4 was amended by Pub. L. No. 48-2012 (eff. July 1, 2012). The changes to the statute became effective after the filing of the termination petition involved herein and are not applicable to this case.

chapter are true, the court *shall* terminate the parent-child relationship. I.C. § 31-35-2-8 (West, Westlaw through end of 2011 1st Regular Sess.).

On appeal, Father challenges the sufficiency of the evidence supporting the juvenile court's findings as to subsection (b)(2)(B) of the termination statute cited above.[3] *See* I.C. § 31-35-2-4(b)(2). Specifically, Father claims that the "conditions which brought about the removal of the child were circumstances directly attributable to conduct of the mother." *Appellant's Brief* at 9. Father further asserts that although he "admittedly" was not compliant with the juvenile court's dispositional orders, he nevertheless "participated in services" and "showed an ability to benefit from said services" while he was incarcerated. *Id.* Father therefore contends he is entitled to reversal.

At the outset, we note that DCS needed to establish only one of the three requirements of subsection (b)(2)(B) by clear and convincing evidence before the juvenile court could terminate parental rights. *See In re L.V.N.*, 799 N.E.2d 63 (Ind. Ct. App. 2003). Here, the juvenile court found DCS presented sufficient evidence to satisfy the first subsection of (b)(2)(B) of the termination statute, namely, that there is a reasonable probability the conditions resulting in S.F.'s removal or continued placement outside Father's care will not be remedied. *See* I.C. § 31-35-2-4(b)(2)(B)(i).

---

[3] Father does not challenge the sufficiency of the evidence supporting the juvenile court's findings regarding the remaining elements of Indiana's termination statute, including whether the child was removed from Father's care for the requisite amount of time, whether termination of parental rights is in S.F.'s best interests, and whether there is a satisfactory plan for the future care and treatment of the child. *See* I.C. § 31-35-2-4(b)(2)(A), (C), and (D). Father has therefore waived appellate review of these issues. *See Davis v. State*, 835 N.E.2d 1102, 1113 (Ind. Ct. App. 2005) (concluding that failure to present a cogent argument or citation to authority constitutes waiver of issue for appellate review), *trans. denied.*

In making such a determination, a juvenile court must judge a parent's fitness to care for his or her child at the time of the termination hearing, taking into consideration evidence of changed conditions. *In re J.T.*, 742 N.E.2d 509 (Ind. Ct. App. 2001), *trans. denied*. The court must also evaluate the parent's habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation of the child. *In re M.M.*, 733 N.E.2d 6 (Ind. Ct. App. 2000). Similarly, courts may consider evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment. *A.F. v. Marion Cnty. Office of Family & Children*, 762 N.E.2d 1244 (Ind. Ct. App. 2002), *trans. denied*. The juvenile court may also consider the services offered to the parent by a county office of the Indiana Department of Child Services and the parent's response to those services, as evidence of whether conditions will be remedied. *Id.* Finally, we have previously explained that the language of Indiana's termination statute makes clear that "it is not just the basis for the initial removal of the child that may be considered for purposes of determining whether a parent's rights should be terminated, but also those bases resulting in the continued placement outside of the home." *In re A.I.*, 825 N.E.2d 798, 806 (Ind. Ct. App. 2005), *trans. denied*

Here, in determining that there is a reasonable probability the conditions resulting in A.P.'s removal and/or continued placement outside of Father's care will not be remedied, the juvenile court made detailed findings in its termination order regarding Father's (1) significant history of criminal activity and current incarceration, (2) unresolved parenting, housing, and employment issues, and (3) lack of progress in improving his ability to provide

8

a safe and stable home for S.F. In noting Father's extensive criminal history, the juvenile court found that Father was incarcerated and serving an enhanced sentence for theft when S.F. was born due to his habitual offender status. The court went on to observe that Father remained incarcerated for the first three years of S.F.'s life until 2009, was again incarcerated in Noble County from January 2010 "until late February or early March 2010," was "violated on his parole in April 2010," was served with a warrant in October 2010 for battery stemming from a July 2010 "battery resulting in injury charge" while he was already incarcerated on a theft charge, and remained incarcerated at Westfield Correctional Facility at the time of the termination hearing with an expected release date not until March 2012. *Appellee's Appendix* at 3-4.[4] The court then specifically found, "In total, [Father] has been released from prison with the ability to contact [S.F.] for a total of seven (7) months of her five years of life." *Id*. at 4.

Regarding Father's lack of compliance with the court's remaining dispositional orders, the juvenile court specifically found that Father has "only held employment for a total of two years" since the time he was eighteen years old. *Id.* At the time of the termination hearing, Father was thirty-two years old. The court also found Father had failed to complete a psychological evaluation and never completed a parenting assessment despite having multiple scheduled appointments to do so, including appointments in October 2009, December 2009, and two in March 2010.

---

[4] The copies of the juvenile court's judgment provided by the Appellant in both the Appellant's Brief and Appendix are missing a page. We therefore cite to the Appellee's Appendix.

Although the court acknowledged in its findings that Father had enrolled in some services while incarcerated, including parenting classes, the court went on to note that at the time of the termination hearing, Father had completed only four of the twelve parenting classes while incarcerated and "will not be able to complete the program before his release date." *Id.* The court went on to find that S.F. has been "the subject of multiple case investigations reflecting a history of neglect and child endangerment." *Id.* Based on these and other findings, the juvenile court concluded:

> Despite being reminded that he needed to stay away from criminal activity, [Father] was arrested for battery and for theft in 2010 resulting, again, in his long[-]term incarceration. [Father] has been found to be a[] habitual offender and has [a] historic pattern of behavior that includes criminal offense and violation of his conditional release/parole from a time prior to the child's birth. Although [Father] enrolled in services after his incarceration in Westfield Correctional Facility, there has not been any time after his release from a structured environment to test whether he has truly benefitted from the services he received. Since [sic] he has not completed parenting instruction either under the Dispositional Decree or while at Westville, additional time will be required to ensure that [Father] is prepared for the child to be reunited into his care.
>
> * * *
>
> The child has emotional and educational behavioral problems that require a safe, dependable, and consistent environment. The only person with whom [S.F.] has had a consistent relationship is her [sibling]. If reunification efforts are resumed, the child may be separated from the only person which has been a constant in her life. In contrast, termination of parental rights will afford [S.F.] a safe and stable environment in an adoptive home with [R.V.]. . . . [Father's] historic pattern of behavior suggests that he will unlikely be able to sustain the type of supportive environment that the child requires. This conclusion is especially true in light of [Father's] limited circle of support. The child has been out of the home and in licensed foster care for two years because of [Father's] decision to engage in illegal behaviors. [S.F.] is entitled to a safe, sustainable[,] permanent placement.

*Id.* at 6. Our review of the record leaves us convinced that these findings and conclusions are

10

supported by abundant evidence.

During the termination hearing, several DCS case managers, including Graydon Vanderwall, Molly Hall, and Jennifer Rasey testified as to Father's failure to progress in services. In so doing, Vanderwall confirmed that Father had failed to complete parenting classes and home-based services during the CHINS case. Vanderwall further testified that Father had never achieved stable housing and violated the Safety Plan by failing to notify DCS in January 2010 that he had been incarcerated and by leaving S.F. with the maternal grandmother in violation of the express terms of the Safety Plan in place at the time of his incarceration.

As for visitation with S.F., Hall confirmed that Father failed to visit regularly with S.F. when he was not incarcerated, explaining that Father "had three total visitations" with S.F. *Transcript* at 94. Hall further reported that during the time Father was not incarcerated, he "no show[ed]" for scheduled visits approximately "five or six" times. *Id.* Hall also testified that in June 2010 she had discussed with Father "the important[ce] of [Father] cooperating with probation" and "staying out of jail if he wanted a shot at reunification with S.F.," but that Father "ended up getting re-incarcerated at the end of August 2010." *Id.* at 95. This Court has repeatedly recognized that "[i]ndividuals who pursue criminal activity run the risk of being denied the opportunity to develop positive and meaningful relationships with their children." *Castro v. State Office of Family & Children*, 842 N.E.2d 367, 375 (Ind. Ct. App. 2006), *trans. denied*.

When asked whether DCS had any continuing concerns regarding Father should S.F.

11

be returned to Father's care following his release from incarceration, Rasey stated, "The Department would have concerns returning S.F. to [Father] based on his recurring incarcerations. His mother [paternal grandmother] has already been disqualified as a caretaker of S.F.[,] so she would not be allowed to take care of [S.F.] should [Father] get rearrested again." *Transcript* at 129. Rasey further testified that there had been "numerous open cases" involving S.F. in the past and that S.F. had not had a "stable life since she was very little." *Id.* at 136. Concerns regarding Father's unresolved parenting issues and criminal activities were likewise echoed in the testimony of Guardian ad Litem (GAL) David Joley. In recommending termination of Father's parental rights, GAL Joley informed the juvenile court that "some of [Father's] decisions have made S.F. vulnerable" in the past, and although Joley believes Father loves S.F., he does not believe Father has the "support network in place" to make reunification a viable option. *Id.* at 144, 146. Joley expressed additional concerns regarding Father's ability to provide S.F. with "stable housing" and the "emotional support" that the child needs. *Id.* at 145.

As previously explained, a juvenile court must judge a parent's fitness to care for his or her children at the time of the termination hearing, taking into consideration the parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the children. *D.D.*, 804 N.E.2d 258 (Ind. Ct. App. 2004), *trans. denied*. Where a parent's "pattern of conduct shows no overall progress, the court might reasonably find that under the circumstances, the problematic situation will not improve." *In re A.H.*, 832 N.E.2d 563, 570 (Ind. Ct. App. 2005). Moreover, a juvenile court need not wait until a child is irreversibly

influenced by a deficient lifestyle such that his or her physical, mental, and social growth are permanently impaired before terminating the parent-child relationship. *In re E.S.*, 762 N.E.2d 1287 (Ind. Ct. App. 2002).

Throughout the underlying proceedings, Father has demonstrated a persistent unwillingness and/or inability to take the actions necessary to show he is capable of refraining from criminal activity and of providing S.F. with the safe and stable home environment the child needs. Based on the foregoing, we conclude that that there is clear and convincing evidence to support the juvenile court's findings set forth previously, as well as the court's ultimate determination that there is a reasonable probability the conditions leading to S.F.'s removal and continued placement outside Father's care will not be remedied. Father's arguments to the contrary amount to an impermissible invitation to reweigh the evidence. *See D.D.*, 804 N.E.2d 258.

This Court will reverse a termination of parental rights "only upon a showing of 'clear error'– that which leaves us with a definite and firm conviction that a mistake has been made." *In re A.N.J.,* 690 N.E.2d 716, 722 (Ind. Ct. App. 1997) (quoting *Egly v. Blackford Cnty. Dep't of Pub. Welfare*, 592 N.E.2d 1232, 1235 (Ind. 1992)). We find no such error here.

Judgment affirmed.

NAJAM, J., and BRADFORD, J., concur.